[Cite as *In re A.L.*, 2016-Ohio-3189.]

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| A.L., | : | No. 15AP-1040 |
| | | (C.P.C. No. 14JU-18) |
| [W.L., II, | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant]. | : | |
| In re: | : | |
| | | No. 15AP-1045 |
| W.L., III, | : | (C.P.C. No. 14JU-19) |
| [W.L., II, | : | (ACCELERATED CALENDAR) |
| Appellant]. | : | |

# D E C I S I O N

## Rendered on May 26, 2016

**On brief:** *John T. Ryerson,* for appellant.

**On brief:** *Robert J. McClaren,* for appellee Franklin County Children's Services.

APPEALS from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch

HORTON, J.

{¶ 1} Appellant-father, W.L., II, appeals from two judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, in case No. 14JU-18 (hereinafter "A Record") and case No. 14JU-19 (hereinafter "W Record") that terminated his parental rights and granted permanent custody of his minor children, A.L. and W.L., III, to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2}   On January 2, 2014, FCCS filed two complaints in the trial court, alleging that A.L. and W.L., III, were neglected and dependent children under R.C. 2151.03(A)(2) and 2151.04. At the time, W.L., III, was 15-months old and A.L. was almost 3. FCCS had received reports that the children, along with their 3 half-siblings, were living with father and their mother in a "known drug house" that was "infested with fleas and bedbugs" where "adults [were] smoking cocaine in the bathroom." (A and W Record, Compl.) The children were largely unsupervised, displayed "unexplained injuries," and had been exposed to domestic violence. *Id.* A visiting caseworker observed "multiple individuals sneaking in and out of the back door as pit bulls roamed the home." *Id.* Prior to filing the complaints, W.L., III's parents had allowed FCCS to place him with a caretaker in July 2013, after they had failed to provide him with follow-up medical care in the wake of surgery he had undergone at the age of 3 months. Both parents had been referred to alcohol and drug ("AOD") assessments and screenings "to determine their treatment needs," but missed "numerous" appointments. *Id.*

{¶ 3}   On February 19, 2014, the trial court adjudicated A.L. and W.L., III, as neglected children. FCCS had requested the dismissal of the dependent causes of action.

{¶ 4}   A case plan filed on February 13, 2014, required father to provide clean drug screens to FCCS, complete AOD assessments and drug treatment recommendations, be present at all of A.L. and W.L., III's medical appointments, obtain stable and safe housing, be present for all visits with his children, and complete parenting classes. The case plan identified August 2, 2013, as the start date for services. All requirements were due to be completed by September 3, 2014.

{¶ 5}   A case plan review filed on July 8, 2014, stated that father had made "some progress" towards these goals. (W Record, Semi-Annual Administrative Review, 5.) At that time, he was going to drug and alcohol classes, was working, and had obtained an apartment. Although he had missed some drug screens, the ones he had submitted were negative. Father was not taking parenting classes. He had missed a visit and an appointment, "but normally ma[de] all appointments." *Id.* He had stopped taking medication to treat his mental health problems and received Supplemental Security Income from Social Security due to a traumatic brain injury.

{¶ 6}  FCCS filed motions for permanent custody of A.L. and W.L., III, on November 21, 2014, based on their parents' failure to meet their case plan requirements. FCCS cited mother's almost complete failure "to complete case plan objectives toward reunification," and stated that she was "homeless and her whereabouts are unknown." (A Record, Motion for Permanent Custody, 5.) FCCS acknowledged that father had "made some progress with his case plan objectives," but stated that he had "recently relapsed" after participating in a drug treatment program. *Id.* FCCS also cited his lack of "stable housing" and "many health issues," as well as positive drug screens that he had completed. *Id.*

{¶ 7}  Another case plan update was filed on December 30, 2014. It stated that father was living with his mother and had been clean for a month, although he had relapsed the summer before. He was reportedly attending Narcotics Anonymous meetings daily and receiving drug treatment. (A Record, Semi-Annual Administrative Review, 5.)

{¶ 8}  On April 3, 2015, the trial court suspended father's visitation with the children and ordered him not to enter FCCS property after he made threats to a caseworker who had tried to visit him in the hospital, where he had been admitted after a suicide attempt. (W Record, Apr. 3, 2015 Jgmt. Entry.)

{¶ 9}  There were three continuances filed during the first half of 2015 on the matter. Two were filed at the request of the "parents" on January 15, 2015, and May 11, 2015. One was filed at the request of all parties on March 2, 2015.

{¶ 10} According to a case plan update filed on June 11, 2015, father had reportedly gone to an inpatient facility after the hospitalization. However, FCCS stated that "he has not been heard from, and there has been no information on where he is." (A Record, Semi-Annual Administrative Review, 4.)

{¶ 11} Trial on the motion for permanent custody was held on October 13, 2015. The children's mother did not appear. Her attorney described repeated attempts to contact her but stated that he had "not had any contact with her in some months." (W Record, Oct. 13, 2015 Tr., 8.) The trial court granted his motion to withdraw from the case. *Id.*

{¶ 12} Father's attorney moved the court for a continuance, stating that his client had recently been admitted to a residential drug and alcohol treatment center and would

be released in November or December. *Id.* at 9. He relayed father's request "to continue this matter so that he can complete his drug and alcohol program and get into aftercare, move back to Columbus and establish a residence," in accordance with the case plan. *Id.* at 9. He acknowledged that father had been "very late" in taking the action of going to residential drug treatment. *Id.* at 9-10. FCCS objected to the continuance, pointing out that the children had been in custody for two years, and a short continuance would still require an extensive additional period of time for father to comply with "many other components of the case plan," which, after so long, must yield to the children's interests in permanent placement. *Id.* at 10. The children's guardian at litem concurred with FCCS. *Id.*

{¶ 13} The trial court orally overruled the motion and heard the evidence FCCS presented in support of its motion for permanent custody. In a decision and judgment entry dated October 16, 2015, the trial court set forth findings of fact and conclusions of law, and granted permanent custody of W.L., III, and A.L. to FCCS. Addressing father's request for a continuance in the entry, the court stated:

> The court wishes [father] well in his pursuit of continued sobriety. These companion cases when combined with their predecessor cases have been pending for over two years.[1] Successful remission of drug addiction is not the only unresolved component of [father's] case plan. The court cannot in good conscience, in the best interests of these six children, prolong these cases for yet another year or two awaiting the possibility of a parent successfully completing an aging case plan. The oral Motion for Continuance on the day of trial is OVERRULED.

(Emphasis sic.) (W Record, Decision and Jgmt. Entry, 1-2.)

{¶ 14} The trial court considered all of the factors in R.C. 2151.414(D), as required to determine whether granting permanent custody is in a child's best interest. The court noted that W.L., III, A.L., and their half-siblings were all in the same foster home, where "their educational, medical, physical and emotional needs" were being met and they were "very bonded" to their foster mother and father. *Id.* at 8.

---

[1] The "predecessor" cases mentioned by the trial court referred to cases involving the half-siblings of A.L. and W.L., III.

{¶ 15} Regarding father's case plan for reunification with W.L., III, and A.L., the court stated:

> He was presented with a case plan which required him, after admitting the use of heroin, cocaine and marijuana, to perform random drug tests, take an alcohol/drug assessment, achieve safe stable housing, obtain stable income from employment, visit the children regularly, attend the children's medical appointments, take parenting classes and demonstrate parenting skills and address [his] mental health issues of schizophrenia, depression and suicidal [and] homicid[al] ideations and physical health issues due to traumatic brain injury. He does receive Social Security income for himself. This alone would not support the children unless they were eligible to receive benefits under his eligibility. He also admitted to a social worker that he worked "under-the-table" but provided no proof of income.
>
> [Regarding] random drug tests, [father] was offered 151 screens. He completed 45, and of those 13 were concerning. His last screen was in June, 2015. He did complete an alcohol/drug assessment * * *. He began attending group counselling sessions sporadically, then stopped. Thus, he has not until September 30, 2015, with his entrance into impatient treatment, addressed his drug issues. He attended some children's medical appointments.
>
> He never achieved safe, stable and suitable housing, and was homeless, in and out of mental health facilities, or residing in the same unsuitable housing with mother. He failed to take the parenting classes * * *. While he did visit and was bonded to his children, he was not observed to be parental towards [their half-siblings]. He was totally absent from visitation from July 21, 2014 to November 21, 2014, a period of five months. After threats to a caseworker, his visits were suspended.
>
> He has never addressed his mental and physical health issues. For these reasons, the court cannot return his children to his custody.
>
> * * *
>
> The children are thriving in their foster home. The foster parents wish to adopt all five of the minor children and seek to adopt [W.L., III and A.L.'s oldest half-sibling] as an adult. Each child is now able to be a child, living in a loving

> structured home where educational, medical, psychological, emotional and physical needs are willingly met. Each child's condition in all of these aspects has greatly improved in this home where each is fully integrated.

*Id.* at 13-14.

{¶ 16} Father appeals, asserting the following assignment of error:

> The Court below erred in granting the Motion [of] Franklin County Children Services (FCCS) for Permanent Custody.

## II. ANALYSIS

{¶ 17} A parent's liberty interest "in the care, custody, and control of their children" is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Thus, termination of parental rights "should be an alternative of 'last resort.' " *In re D.A.*, 113 Ohio St.3d 88, 91, 2007-Ohio-1105, ¶ 11, quoting *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979). A parent faced with the state's motion for permanent custody " 'must be afforded every procedural and substantive protection the law allows.' " *Id.* at ¶ 10, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). To terminate parental rights, a court must find "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody," and that the child's current circumstances align with one of a number of statutory factors. R.C. 2151.414(B)(1).

{¶ 18} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. Permanent custody judgments which are supported by some competent, credible evidence going to all essential elements of a case will not be reversed as being against the manifest weight of the evidence. *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

{¶ 19} In this appeal, however, father does not argue that the trial court's decision granting permanent custody to FCCS was against the manifest weight of the evidence. His appeal contests no factual finding of the trial court, including his non-compliance with the case plan objectives. Nor does he challenge the trial court's application of the R.C. 2151.414 factors that are a prerequisite to granting a motion for permanent custody. Instead, he argues that the trial court abused its discretion by overruling his motion for a

continuance, arguing that it was necessary to allow him to complete an inpatient drug treatment program and seek medical treatment for a traumatic brain injury. (Appellant's Brief, 14.) Because the trial court denied the continuance, father argues, "permanent custody was improvidently granted, and not in the best interest of the children." *Id.*

{¶ 20} We review a trial court's decision to grant or deny a continuance under an abuse of discretion standard. *State v. Ungar*, 67 Ohio St.2d 65, 67 (1981). "In considering whether a trial court abused its discretion in denying a motion for continuance, we consider the length of the requested delay, prior continuances requested and received, the presence or absence of legitimate reasons for the requested delay, appellant's participation or contribution to the circumstances giving rise to the request for a continuance, and any other relevant factors." *In re B.G.W.*, 10th Dist. No. 08AP-181, 2008-Ohio-3693, ¶ 23, citing *Ungar*, at 67-68.

{¶ 21} As an initial matter, we note that although father now asserts that allowing him time to "have his issues involving his previous traumatic brain injury addressed" should have been grounds for granting the continuance; he never presented this reason to the trial court. (Appellant's Brief, 14.) According to the transcript, his attorney requested the continuance so that father could "complete his drug and alcohol program and get into aftercare, move back to Columbus and establish a residence." (W Record, Oct. 13, 2015 Tr., 9.) No mention was made to the trial court of medical treatment for traumatic brain injury as a basis for the continuance. "A party who fails to raise an argument in the trial court waives the right to raise it on appeal." *Harding Pointe, Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 13AP-258, 2013-Ohio-4885, ¶ 43, citing *Betz v. Penske Truck Leasing Co., L.P.*, 10th Dist. No. 11AP-982, 2012-Ohio-3472, ¶ 34. Accordingly, we disregard the portion of father's argument asserting that his need to address his traumatic brain injury should have been grounds for granting the continuance.

{¶ 22} Turning to the *Ungar* factors, we first consider the length of the requested delay. On its surface, a delay of four to five weeks for father to complete his drug and alcohol treatment does not appear to be of undue length. However, his attorney also noted the need for father to move back to Columbus and establish residency. Thus, even though the treatment program had a somewhat identifiable end date, the requested delay was of no real determinable length. It would have been impossible for the trial court to know

how long it would take for father to establish housing after completing treatment. In the past, he had failed to successfully establish housing after drug treatment. The requested continuance was, in reality, a request for a reset on two of the most important goals of the case plan, drug and alcohol treatment and stable housing. The trial court's best guess was that the delay would "prolong [the] cases for another year or two awaiting the possibility of a parent successfully completing an aging case plan." (W Record, Decision and Jgmt. Entry, 2.)

{¶ 23} Because the length of the delay was essentially indefinite, this factor weighs heavily against finding that the trial court abused its discretion when denying the request.

{¶ 24} Second, there were two prior continuances that entries in the record indicated that were requested by the "parents." The record is not clear as to which parent was primarily responsible for either request. An additional request was made at the request of all parties. Because the record does not provide the reasons underlying the continuance, they may not be particularly attributable to father, and therefore hold little weight in our analysis.

{¶ 25} Third, we consider "the presence or absence of legitimate reasons for the requested delay." *In re B.G.W.* at ¶ 23. Treatment for drug and alcohol addiction is a legitimate reason for the requested delay, and would typically weigh in favor of granting a continuance.

{¶ 26} In the end, however, any legitimate reason must be weighed against the "appellant's participation or contribution to the circumstances giving rise to the request for a continuance, and any other relevant factors." *Id.* at ¶ 23. In this case, father never obtained the stable housing or the drug treatment required by the case plan, thereby contributing to the circumstances giving rise to the request for a continuance. Although he had made some efforts at treatment and housing over the previous two years, he did not obtain the success or stability required by the case plan. At that point, the trial court did not abuse its discretion by prioritizing the welfare of the children. "The fundamental interest of parents is not absolute, however. Once the case reaches the disposition phase, the best interest of the child controls." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 11 (reversing a lower court's decision to terminate parental rights based "solely on the

limited cognitive abilities of the parents" who otherwise successfully complied with a case plan).

{¶ 27} A parent requesting a continuance to allow for additional time to meet the objectives of a two-year old case plan on the same day the state begins to present evidence supporting its motion for permanent custody bears a heavy burden to show that denying the continuance is an abuse of discretion. *See In re M.K.*, 10th Dist. No. 09AP-1141, 2010-Ohio-2194 (affirming the trial court's denial of a motion for a continuance of a permanent custody commitment proceeding made the day of the hearing after two continuances, during which mother had two years to complete the reunification case plan requirements); *In re J.C.*, 10th Dist. No. 10AP-766, 2011-Ohio-715 (affirming the trial court's denial of an incarcerated mother's motion for a continuance, as granting it would have been futile in light of her inability to comply with case plan requirements addressing "housing, employment, sobriety, [and] transportation").

{¶ 28} In *In re B.G.W.*, we held, under very similar circumstances, that the lower court did not abuse its discretion when it denied a motion for continuance made by a mother who, after a period of incarceration, entered a residential drug treatment program shortly before a permanent custody hearing. The mother had 18 months to comply with the case plan but waited until the eve of trial to start treatment. *Id.* at ¶ 26. Here, an even longer period of time passed for father to meet case plan objectives, as FCCS had initiated services with him on August 2, 2013, and the permanent custody hearing was held on October 13, 2015.

{¶ 29} We also noted in *In re B.G.W.* that "a continuance likely would not have changed the outcome of the case" because "two months may have allowed appellant to demonstrate some progress toward dealing with her drug addiction, but it would not have remedied the multiple other ways in which appellant failed to comply with the basics of the case plan the trial court approved and adopted." *Id.* at 27. Here, too, father faced a number of challenges to complying with the case plan, apart from merely being discharged from drug and alcohol treatment, such as obtaining housing, an income to support the children, and regularly attending parenting classes. After being discharged from a treatment center, he may have demonstrated "some progress" regarding his addiction issues, but still been at square one on many of the other case plan requirements.

As in *In re B.G.W.*, a continuance would not have changed the outcome of the case. In light of that reality, the trial court did not err when it denied the request for a continuance and granted the motion for permanent custody.

## III. CONCLUSION

{¶ 30} For the foregoing reasons, the sole assignment of error is overruled, and the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, are affirmed.

*Judgments affirmed.*

DORRIAN, P.J. and TYACK, J., concur.

———————————